IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RICHARD GRISSOM,

        Plaintiff,

vs.                            No. 07-3302-SAC

ROGER WERHOLTZ, et al.,

        Defendants.


MEMORANDUM AND ORDER

This case filed by an inmate under 42 U.S.C. § 1983 comes before the court on Defendants' motion for summary judgment.[1] Plaintiff seeks damages and injunctive relief on six[2] grounds alleging the violation of his constitutional rights while confined in Kansas correctional facilities. Defendants are Roger Werholtz as Secretary of the Kansas Department of Corrections (KDOC),[3] Ray Roberts as Warden of the El Dorado Correctional Facility (EDCF), Louis Bruce as former Warden of the Hutchinson Correctional Facility (HCF), Sam Cline as the current Warden of HCF, David McKune as Warden of Lansing Correctional Facility (LCF), Duane

---

[1]Defendants' motion was filed as a motion to dismiss, but the Court previously gave notice that it was converting Defendants' motion to dismiss to a motion for summary judgment. Dk. 63.

[2] The Court previously dismissed the first four grounds as stating no claim for relief. *See Grissom v. Werholtz*, 2008 WL 4305573 (D. Kan. Sept. 18, 2008); Dk. 15.

[3] Defendant Werholtz retired after Plaintiff filed this complaint.

Muckenthaler as an LCF Correctional Counselor, Debra McConaghy as an HCF Correctional Counselor, and Thomas Phelan as the EDCF Chaplain.

## I. Summary Judgment Standard

On summary judgment, the movant bears the initial to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from which a rational fact finder could find in the non-movant's favor. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986).

The Court draws all justifiable inferences about disputed facts in Plaintiff's favor, but those "inferences must accord deference to the views of prison authorities" with respect to matters of professional judgment. *Beard v. Banks*, 548 U.S. 521, 529-30 (2006).

2

## II. Uncontested Facts

Plaintiff was convicted after a jury trial in Kansas of three counts of first degree murder, one count of aggravated kidnapping, four counts of robbery, two counts of aggravated burglary, and one count of misdemeanor theft. The Kansas Supreme Court affirmed his convictions for all offenses, and affirmed his four consecutive life sentences for first-degree murder and aggravated kidnapping. *State v. Grissom,* 251 Kan. 851 (1992). At all times relevant to this complaint, Plaintiff was an inmate in the custody of the Kansas Secretary of Corrections.

Plaintiff has been in administrative segregation continuously since 1996. His initial placement was "pending investigation," as he was being investigated for extorting an inmate and illicit activity. Plaintiff was placed in lockdown at LCF without a disciplinary report, write-up, or hearing.[4]

On October 28, 1996, Plaintiff's status was changed to "Other Security Risk" (OSR), without a hearing. In October and December, Plaintiff was told he would soon be returned to general population, but on December 31, 1996, Plaintiff was bussed to EDCF administrative segregation.

In March of 1997, Plaintiff sought an explanation of his continued segregation and learned that LCF's Intelligence and Investigation (I & I) Department had identified Plaintiff as a key participant in the procurement and trafficking of contraband drugs into LCF. Due to the "elaborate methods"

---

[4] Defendants have not presented a chronology prior to 2005, but for purposes of this motion, the Court states the facts in the light most favorable to the Plaintiff.

used to traffic those drugs, Defendants believed Plaintiff, if released to general population, would be a threat to EDCF's security. Plaintiff believed that his continued segregation instead reflected the Central Office's reaction to public pressure due to the notoriety of his crimes. Plaintiff thereafter sought but did not receive an explanation from EDCF's I&I. But Plaintiff received his 120-day review from the Program Management Committee, dated in December of 1997, which stated two justifications for his continued detention in administrative segregation: 1) LCF I&I's determination that Plaintiff had been identified as a "key participant" in the trafficking of narcotics into LCF; and 2) "while on Parole, [Plaintiff] kidnapped and murdered three people." Dk. 64, Exh. 4.

On February 15, 2001, Plaintiff's Administrative Segregation status of OSR was changed to Extreme Escape Risk, without any disciplinary report or hearing. EDCF's I&I had intercepted a letter addressed to Plaintiff, stating the writer's desire to get Plaintiff out of prison once Plaintiff was released to general population. Because of the letter,[5] EDCF believed that Plaintiff posed a potential for escape and a serious risk to the facility. Plaintiff's Administrative Segregation status was returned to OSR status on June 6, 2003.

From the summer of 1996 to November 24, 2003, Plaintiff was on the highest level attainable, level 3. He received no disciplinary reports during

---

[5] Plaintiff does not know who sent the letter, but speculates that it may have been sent by his fiancée solely to encourage him.

4

over seven years of administrative segregation, and has accumulated few disciplinary "write ups" during his incarceration.

But on Tuesday, November 25, 2003, officers searched Plaintiff's cell at EDCF and found several contraband items, including a cellular phone with extra batteries and accessories. Plaintiff was charged with violating K.S.A. 21-3826 (now K.S.A. 2011 Supp. 21-5914), Traffic in Contraband in a Correctional Institution, a felony (Case No. 03-11-159). Plaintiff pled no contest and was placed in disciplinary segregation for 30 days. Dk. 55, Exh. 30.

On January 26, 2005, during a strip search at EDCF, officers found a cellular phone on the floor near Plaintiff. Plaintiff was charged with violating K.A.R. 44-12-901, Dangerous Contraband-Class I (Case No. 05-01-171). Plaintiff again pled no contest and was placed in disciplinary segregation for 30 days. Dk. 55, Exh. 31.

On June 1, 2005, at LCF, officers searched Plaintiff and found a cellular phone on him. A search of his cell revealed additional contraband including another cellular telephone, chargers for the telephones, sandpaper, razors, a soldering iron, screwdriver and drill bits. Plaintiff was again charged with violating K.A.R. 44-12-901, Dangerous Contraband-Class I. Plaintiff pleaded not guilty, and participated in a disciplinary hearing conducted by telephone on June 21, 2005. Plaintiff was found guilty and was given 45 days in disciplinary segregation. Dk. 55, Exh. 68. Plaintiff considers cell phones to be

5

"easily obtainable and virtually ubiquitous in the prison system." Dk. 64, p. 7.

Because of the seriousness of Plaintiff's three violations concerning contraband, officers determined that a "more detailed management plan" for Plaintiff was needed. The special management reflected in the protocol "was made necessary after it became clear that [Plaintiff] was involved with the buying and selling of contraband at the Lansing Correctional Facility and that he was adroit at developing relationships with correctional staff." Dk. 55, Exh. 2, p. 2 (Werholtz affidavit).

Defendant Bruce initially developed the protocol and first applied it when Plaintiff transferred to HCF on June 8, 2005. It provided for the following: two cameras focused on Plaintiff's cell 24 hours a day; contact with Plaintiff by stated persons only; screening of Plaintiff's outside contacts such as phone calls; limitations on Plaintiff's time in the yard and in showers; frequent checks of Plaintiff's cell and the area behind it; inspections of all items given to the Plaintiff; documentation of anyone having contact with Plaintiff other than the routine rounds; and requirements regarding the position of Plaintiff's outside door and shower door (to enhance visibility). Dk. 55, Exh. 4.

Plaintiff was also transferred to other institutions to prevent the formation of any relationships that may assist him to acquire dangerous contraband. Plaintiff was moved approximately every four months among

6

the El Dorado Correctional Facility (EDCF), Hutchinson Correctional Facility (HCF), and Lansing Correctional Facility (LCF). Defendants McKune and Muckenthaler at LCF and Defendant Roberts at EDCF adopted and implemented a protocol concerning Plaintiff similar to the protocol at HCF.

Plaintiff considered administrative segregation at HCF to be severe and prolonged, unsanitary and dangerous. His cell was shaken down at least five times per week, as often as three times per day, resulting in its disarray. Temperatures in the "slam cell" were so extreme that Plaintiff suffered heat stroke one day. Inmates are not regularly subjected to more than two weeks in "MRA" cells, but Plaintiff was confined there for four months at a time. Reading material in the MRA cells was limited to old encyclopedia volumes, and no magazine subscriptions were permitted.

On February 7, 2006, Plaintiff was transferred to administrative segregation at LCF, without his personal property. Plaintiff was housed in an More Restricted Area (MRA) cell, normally used for mentally disturbed or the most disruptive inmates. His cell was shaken down a minimum of eight times a week, and a camera was trained on the interior of his cell to monitor his every move, twenty-four hours a day. Plaintiff alleges that the filth and noise caused him extreme mental and physical stress. When Plaintiff asked Defendant Muckenthaler who authorized these measures, he was told that "...It came down from Central Office in Topeka." Plaintiff requested

handicrafts appropriate to his level-two status, Affidavit, ex. 7 [IMPP 11-101]), but was denied even "papercraft, painting and sketching."

On June 20, 2006, Plaintiff was transferred to HCF and another MRA cell. He requested magazines and handicrafts commensurate with his current security level and KDOC's general orders 22-102, 22-104 (Dk. 64, Exh. 9), IMPP 11-101 (Dk. 64, Exh. 8), and IMPP 20-105, but was denied. Plaintiff was told that he could not possess any magazines or subscription publications.

Plaintiff attempted to return to the general population. On October 2, 2006, Plaintiff submitted, through Defendant McConaghey, a request to that effect to HCF's Segregation Review Board, but McConaghey claimed she never received it. On November 7, 2006, he submitted another request, notarized by McConaghy. On November 9, 2006, Plaintiff was informed by someone on HCF's Segregation Review Board that it lacked authority over Plaintiff, and that all decisions related to him must come from the "Central Office." Dk. 64, Exh. 1, para. 9.

On November 21, 2006, Plaintiff was transferred back to the MRA cell at LCF, without his property. The conditions he previously experienced there persisted. On October 11, 2007, Plaintiff was transferred back to HCF. Again, all magazines were banned.

Plaintiff remains in administrative segregation under "Other Security Risk" status for the sixteenth consecutive year. The other inmates identified

in the original investigation in 1996 were released or returned to general population within two years. Plaintiff's confinement in segregation since May of 2005 was periodically reviewed by the Segregation Review Boards at the three institutions, even when Plaintiff did not appear or participate. Additional facts shall be included in the Court's analysis of Plaintiff's claims.

## III. Official Capacity

Plaintiff does not indicate whether he is suing Defendants in their personal or official capacities.

The Eleventh Amendment doctrine of sovereign immunity bars actions for damages against a State, its agencies and its officials acting in official capacities, *see Kentucky v. Graham,* 473 U.S. 159, 165–169 (1985), including actions arising under Section 1983, *see Klein v. Univ. of Kan. Med. Ctr.,* 975 F.Supp. 1408, 1415 (D.Kan. 1997). An action against a state official in his official capacity is against the official's office, and accordingly is no different than a suit against the State itself. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989). Accordingly, to the extent that Plaintiff is suing any Defendant in his official capacity, that Defendant is entitled to Eleventh Amendment immunity from money damages under 42 U.S.C. § 1983. *Id.*

## IV. Personal Participation

Defendant Werholtz, the Secretary of the KDOC, moves the Court to dismiss him from the case because Plaintiff has failed to show his personal

participation, as is necessary in § 1983 cases. Because § 1983 imposes liability for a defendant's own actions, "personal participation in the specific constitutional violation complained of is essential." *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011). Thus a plaintiff must name the individuals responsible, and plead the facts showing "exactly *who* is alleged to have done *what* to *whom* to provide each individual with fair notice as to the basis of the claims against him or her." *Smith v. United States*, 561 F.3d 1090, 1104 (10th Cir. 2009) (emphasis in original). Merely hypothesizing that an individual defendant had personal knowledge or involvement is insufficient.

Defendant Werholtz's designee reviewed and responded to Plaintiff's grievances and to his property claims appealed to his office. Dk. 55, Exh. 2. But the Tenth Circuit has repeatedly held "that 'the denial of … grievances alone is insufficient to establish personal participation in the alleged constitutional violations.' " *Whitington v. Ortiz*, 307 Fed.Appx. 179, 193 (10th Cir. 2009)." *Arocho v. Nafziger*, 367 Fed.Appx. 942, 955, 2010 WL 681679, 10 (10th Cir. 2010).

Plaintiff also speculates that Defendant Werholtz may personally have directed that Plaintiff be placed and remain in administrative segregation, or have ordered the protocol regarding his special handling. But Defendant Werholtz has sworn that he "was not directly involved with anything connected with plaintiff's conditions of confinement"; that "he did not have any direct involvement with anything about which plaintiff now complains";

that the "protocol for managing Grissom was developed by then Warden

Louis Bruce at the Hutchinson Correctional Facility"; and that the "details of

the housing rules at each facility were determined by each facility's staff."

*Id.* Consistently, Defendant Bruce has sworn that the "security threats"

posed by Plaintiff's possession of contraband and by Plaintiff's possibly

attempting an escape "compelled [him] to develop a more secure setting

within which to manage Mr. Grissom … [His] security staff and [he]

developed a protocol that was used during plaintiff's three stays." Dk. 55,

Exh. 4.

Defendants' admissible evidence on this issue defeats Plaintiff's

speculation to the contrary. Plaintiff has failed to raise a genuine issue of

fact that Defendant Werholtz may have had any direct personal

responsibility for the claimed deprivations. Because the law precludes

liability based solely on one's position as the Secretary of the KDOC, and

because no facts suggest greater involvement by Werholtz, he is dismissed

from this case.

## V. Qualified Immunity, generally

Defendants assert entitlement to qualified immunity on the remaining

claims. *See generally Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v.*

*Callahan*, __ U.S __, 129 S. Ct. 808, 815 (2009) (quotation omitted).

> When a defendant pleads qualified immunity, the plaintiff has
> the heavy burden of establishing: (1) that the defendant's actions
> violated a federal constitutional or statutory right; and (2) that the

11

right violated was clearly established at the time of the defendant's actions.

*Scott v. Hern*, 216 F.3d 897, 910 (10th Cir. 2000) (quotations omitted).

Defendants contend that their actions did not violate any federal right.

## VI. Deprivation of Property (claim 5)

Plaintiff contends that Defendants Werholtz, McKune, Bruce, Cline, Muckenthaler and McConaghy deprived him of property for 469 consecutive days while he was in administrative segregation at HCF and LCF, violating the Fourteenth Amendment's due process clause and the Eighth Amendment's cruel and unusual punishment clause. Plaintiff makes no complaint about the property he was permitted to have while in administrative segregation at EDCF.

Plaintiff filed a grievance related to this matter (Grievance No. BA00013924) while housed at HCF. In it, Plaintiff alleged that his right to have a mirror and other property, to purchase magazines, and to purchase and participate in Handicrafts had been infringed, but that other inmates in administrative segregation at other facilities had obtained such property. HCF responded that the requested items were not permitted in administrative segregation at HCF. Plaintiff's unit team at HCF showed Plaintiff the list of allowable and unallowable items for inmates in administrative segregation, and provided its grievance response and policies to Plaintiff. Dk. 55, Exhs 14, 21-24.

Plaintiff appealed the denial of his grievance, and Warden Bruce affirmed its denial on Nov. 1, 2006. Plaintiff appealed that decision to the Secretary's office, but was transferred out of HCF pursuant to his rotation schedule soon thereafter. The Secretary's office found that the "problem appears to have been resolved," apparently alluding to the mooting of the matter due to Plaintiff's absence. (Dk. 55, Ex. 14, p.1). Plaintiff contends that because his placement rotation would and did take him back to HCF, the matter was not resolved and property deprivations recurred when he was returned to HCF and LCF.

**A. Fourteenth Amendment - Due Process**

"The Fourteenth Amendment provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.' " *Estate of DiMarco v. Wyoming Dept. of Corrections,* 473 F.3d 1334, 1339 (10th Cir. 2007) (quoting U.S. Const. Amend. XIV). "A due process claim under the Fourteenth Amendment can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered." *Steffey v. Orman,* 461 F.3d 1218, 1221 (10th Cir. 2006) (citation omitted). Plaintiff arguably claims that Defendants violated his property and his liberty interests.

13

## 1. Protected Interest

### a. Property Interest

Property interest claims by prisoners are "reviewed under *Sandin's* atypical-and-significant-deprivation analysis." *Steffey*, 461 F.3d at 1221 (citing *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir. 1999) (other citations omitted). That analysis asks "whether the prison condition complained of presents 'the type of atypical, significant deprivation in which a State might conceivably create a liberty [or property] interest.' " *Cosco*, 195 F.3d at 1224 (alteration in original, quoting *Sandin v. Conner*, 515 U.S. 472, 486, (1995)).

The Tenth Circuit has held that restrictions on the property an inmate may possess are typical, and do not post a significant hardship. "The regulation of type and quantity of individual possession" in prison cells reflects a typical type of restraint imposed on the prison population. *See Cosco*, 195 F.3d at 1224 (permanent separation of an inmate from his property does not amount to an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life). Courts have repeatedly held that it is not unreasonable for a prison to restrict the amount of material that inmates in administrative segregation may have in their cells at any one time. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate

14

goals of a corrections system and for determining the most appropriate means to accomplish them").

Because the prisons' deprivations of property for the stated reasons while Plaintiff was in segregation is not atypical or significant, Plaintiff has failed to raise a material question of fact regarding a protected property interest.

### b. Liberty Interest

Defendants show that Plaintiff was not permitted to participate in the handicrafts program because the materials he needed for that program were not on the approved list at HCF for prisoners in administrative segregation. The Tenth Circuit "has never determined that prisoners enjoy an entitlement to educational or rehabilitation services, only to an environment non-threatening to mental and physical well-being. *Battle v. Anderson*, 564 F.2d 388, 403 (10th Cir.1977)." *Robinson v. Smith*, 1992 WL 367990, 1 (10th Cir. 1992).

Plaintiff's participation in the handicrafts program was subject to the approval of the Unit Team counselor, and that approval was based upon the general orders concerning the materials allowed in the segregation unit. Dk. 55, Exh. 14, p. 10. Although those materials were more limited than the materials specified for persons on certain incentive levels or in the general population, this does not amount to an atypical or significant hardship that would implicate a liberty interest under the Due Process Clause. *See Sandin*,

515 U.S. at 483-85 (explaining that liberty interests created by the states under the Due Process Clause are "generally limited to freedom from restraint").

Further, the prison's general order regarding handicrafts does not create a liberty interest.

> *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454 (1989) … held that in order for a state to create a protected liberty interest in the prison context, the applicable state regulations must use "explicitly mandatory language" in connection with the establishment of "specific substantive predicates" to limit official discretion, and thereby require that a particular outcome be reached upon a finding that the relevant criteria have been met. Id. at 462-63. In the absence of such substantive limitations on prison officials' discretion, no liberty interest is created. (Citations omitted.)

*Hall v. Haughain*, 43 F.3d 1483 (Table) (10th Cir. 1994). HCF General Order 22-102 regarding handicrafts does not substantively limit prison officials' discretion. Instead, it states that "[i]nmates are permitted the opportunity to participate in handicraft activities as authorized by departmental and facility policies and procedures," and that "[i]nmates wishing to participate in any handicraft activities shall request authorization from their Unit Team." Dk. 55, Exh. 51. Attachment B to that G.O. notes that the sole authorized handicraft for persons in administrative segregation is sketching. Plaintiff desired to participate in sketching, but his unit team manager made her own list of allowable and non-allowable items, and it excluded the items Plaintiff desired. That list was periodically changed by each succeeding unit team

16

manager, and was applied to all similarly-situated inmates, not just to

Plaintiff. Dk. 55, Exh. 8.

Additionally, the handicraft general order expressly states that it is not

intended to create a liberty interest:

> The policy and procedures set forth herein ... are not intended to
> establish state created liberty interests for inmates ... or an
> independent duty owed by the Department of Corrections to ....
> Inmates ... This policy and procedure is not intended to establish or
> create new constitutional rights or duties.

Dk. 55, Exh. 51. The record fails to suggest that Plaintiff had any protected

liberty interest in participating in handicrafts while in prison.

## 2. Adequate Procedures

In addition to demonstrating a protected interest, Plaintiff must show

that he was deprived of that interest without due process. A relaxed set of

procedures satisfies an inmate's challenge to a placement decision or

conditions of confinement - due process is satisfied as long as a state (1)

allows a sufficient initial level of process, *i.e.*, a reasoned examination of the

assignment; (2) provides the opportunity for the inmate to receive notice

and respond to the decision; and (3) weighs safety and security as part of

the placement decision. *DiMarco* at 1343 (citing *Wilkinson v. Austin,* 545

U.S. 209, at 226-27 (2005). Due process is not violated if a meaningful

post-deprivation remedy for the loss is available. *Hudson v. Palmer,* 468

U.S. 517, 533 (1984).

Even assuming that Plaintiff had some protected property or liberty interest in the items he could not possess while in administrative segregation, the Court finds that the procedures provided to Plaintiff were constitutionally sufficient. Plaintiff received notice of the reasons supporting the withholding of the desired property, had an opportunity to respond, and was given an opportunity to appeal. *See Hudson,* 468 U.S. at 533, 536 n. 15 (indicating that adequate inmate grievance procedures alone may provide a meaningful post-deprivation remedy for purposes of procedural due process.) Because the facts, read in the light most favorable to the Plaintiff, do not demonstrate that he may have been denied an adequate post-deprivation remedy, Plaintiff has not raised a material question of fact regarding a deprivation of due process, even assuming some protected interest.

### B. Eighth Amendment - Cruel and Unusual Punishment

Plaintiff additionally claims that his deprivation of a mirror, handicraft and other property he desired during his housing in segregated status violates the Eighth Amendment.

The Eighth Amendment "does not mandate comfortable prisons," but requires prison officials to "provide humane conditions of confinement"; to "ensure that inmates receive adequate food, clothing, shelter, and medical care"; and to " 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer v. Brennan*, 511 U.S. 825, 832-833 (1994), quoting

*Hudson,* 468 U.S. at 526–27. Thus a prisoner confined in segregation cannot complain about the conditions of confinement unless he is deprived of the "minimal civilized measure of life's necessities." *Meriwether v. Faulkner,* 821 F.2d 408, 416 (7th Cir.), *cert. denied,* 484 U.S. 935 (1987), (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). Plaintiff's claim that his property deprivations meet this standard is frivolous.

## VII. Magazine Subscriptions (claim 6)

Plaintiff next contends that Defendants Werholtz, Bruce, Cline and McConaghy violated his First Amendment right to free speech and expression by refusing to let him purchase magazines while he was housed in segregation.

### A. Facts

Plaintiff included this claim in Grievance No. BA00013924 filed at HCF (addressed above). Defendants show that during his confinement in segregation Plaintiff had access to some reading material, but was prevented from subscribing to magazines.

The general regulation regarding personal property for inmates in Segregation provided that "all newspapers and periodicals shall be stored in the Unit's Property Storage Room," and that "[r]eading material shall be supplied by the Library and distributed by the Cellhouse Officer." Dk. 55, Exh. 21. *See also* Dk. 55, Exh. 56 (EDCF GO 10-102: "E. Inmates in

segregation shall be authorized "1. Access to reading materials as supplied by the facility library.")

Prison officials believed that the possession of magazines by inmates in segregation raised significant security issues.

> ... the department regarded magazines as an item with significant bargaining value and placed restrictions on the segregation inmates to reduce the items they could use to deal and trade with each other. Significant security issues result from inmates trading with each other, stealing from each other and borrowing value from each other, all or which could result in violence involving collection of debt issues.

McConaghy affidavit, Dk. 55, Exh. 8, para. 28.

Additionally, the protocol established specifically for the Plaintiff required the Warden to approve all library items before they were given to the Plaintiff:

> Anything that is given to the inmate such as clothing, bedding, meals, is to be inspected for contraband. Other than those routine items, anything else that is to be given to the inmate needs my prior approval. This includes anything from contract staff, and library items.

Dk. 55, Exh. 4, p. 3. Plaintiff contends that these restrictions violated his free speech rights.

### B. Free Speech

A prisoner's First Amendment rights are not forfeited, *Turner v. Safley*, 482 U.S. 78, 93 (1987), but may be restricted to a greater extent than if one were not in prison. *Beard,* 548 U.S. at 528. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at

89. That standard recognizes that courts owe "substantial deference to the professional judgment of prison administrators." *Overton,* 539 U.S. at 132.

The Tenth Circuit has repeatedly held that the Warden has broad discretion to limit incoming information, and has found that restrictions on magazine subscriptions are "common." *Al-Owhali v. Holder, et al.*, __ F.3d __ , 2012 WL 3181832 (10th Cir. Aug. 7, 2012). Nonetheless, the Court looks to the four factors "relevant in determining the reasonableness of the regulation at issue." *Turner*, 482 U.S. at 89. 1) Defendants have shown a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. Plaintiff does not address the government's logical safety rationale for limiting his access to magazines – namely, the need to prevent him from receiving or passing contraband hidden in magazines, or from using magazines for bartering. 2) Plaintiff had "alternative means" of exercising his first amendment right, as he had access to information from the prison library. 3) To accommodate Plaintiff's asserted right to subscribe to magazines would have required the prison to grant him an exception from its general order excluding segregation inmates from that privilege, without any good cause and in derogation of the specific risks posed by permitting this Plaintiff to purchase magazines. 4) Plaintiff has not shown that any "ready alternative" to the restrictions would have met the prison's interests of safety and of preventing him from obtaining contraband.

Plaintiff has failed to raise a material question of fact that the restrictions were imposed in violation of prison regulations or that the regulations or protocol applied were unconstitutional in the circumstances. *See Beard*, 548 U.S. at 529 (internal citations omitted) (upholding restriction on all access to newspapers, magazines, and photographs by inmates in the most restrictive level of the long-term segregation unit).

**VIII. Excessive Isolation (claims 7 and 9)**

**A. Claim 9**

In claim 9, Grissom claims that for over eleven consecutive years he was housed in a segregation unit and Defendants Werholtz, Roberts, McKune, and Bruce deprived him from requesting release back into the general population and from participating in self-help programs, thus violating his due process rights under the Fourteenth Amendment. Defendants contend that much of this claim is barred by the statute of limitations.

The statute of limitations for § 1983 claims "is drawn from the personal-injury statute of the state in which the federal district court sits." *Mondragon v. Thompson,* 519 F.3d 1078, 1082 (10th Cir. 2008). The Court thus applies Kansas's two-year statute of limitations for personal injury actions. *See* Kan. Stat. Ann. § 60-513(a)(4). Accordingly, all claims based on acts occurring before December 7, 2005 (two years before the date this lawsuit was filed) are barred by the statute of limitations. This includes, but

is not limited to, any claim that Plaintiff was not afforded the proper hearings before his lockdown in 1996, his transfer to OSR status in 1996, or his transfer to Extreme Escape Risk status in 2001. Other portions of Plaintiff's claim 9 are timely but are duplicative of Plaintiff's claim 7, discussed below.

### B. Claim 7

In claim 7, Grissom contends that Defendants Werholtz, McKune, Bruce and Cline continuously housed him in a segregation unit from June, 2005 to the present, constituting excessive isolation in violation of the due process clause of the Fourteenth Amendment and of the cruel and unusual punishment clause of the Eighth Amendment.

### 1. Due Process – Liberty Interest

Inmates are not entitled to a particular degree of liberty in prison, so ordinarily a change in an inmate's prison classification does not deprive him of any liberty interest. *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (finding "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."); *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994). A decision by a prison official to place an inmate in administrative segregation does not implicate the Due Process Clause of the Fourteenth Amendment unless the confinement presents "the type of atypical, significant deprivation in which a state might conceivably create a

liberty interest." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996) (same); *Talley v. Hesse,* 91 F.3d 1411, 1413 (10th Cir. 1996). Plaintiff raises no challenge to his initial placement in 1996 in administrative segregation, and any such claim would be time-barred.

Additionally, the "extreme conditions in administrative segregation do not, on their own, constitute "atypical and significant hardship" when compared to the "ordinary incidents of prison life," or violate due process rights. *Rezaq v. Nalley*, 677 F.3d 1001, 1013 (10th Cir. 2012). But an extended confinement in administrative segregation can, of itself, constitute an atypical and significant hardship, as Plaintiff contends. *See Payne v. Friel*, 266 F. App'x 724, 728 (10th Cir. 2008) (citing *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 806 (10th Cir. 1999).

The Tenth Circuit has not established a bright-line test stating that a particular length of confinement necessarily creates that hardship. It has, held that a five-year period of administrative segregation did not amount to an atypical, significant hardship, given the legitimate penological interest of investigating the inmate's involvement in a prison murder. *Jordan v. Fed. Bureau of Prisons*, 191 F. App'x 639, 652 (10th Cir. 2006). But it has also signaled that lesser durations of administrative segregation may be atypical. *See e.g., Fogle v. Pierson,* 435 F.3d 1252, 1259 (10th Cir. 2006) (finding three-year period of administrative segregation during which the inmate was

confined to his cell for all but five hours each week and was denied access to any outdoor recreation was arguably "atypical"); *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (finding 750 days in segregation "may itself be atypical and significant.")

The Tenth Circuit focuses on four factors when determining whether placement in administrative segregation implicates a protected liberty interest:

> (1) whether "the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) [whether] the conditions of placement are extreme; (3) [whether] the placement increases the duration of confinement …; and (4) [whether] the placement is indeterminate."

*DiMarco,* 473 F.3d at 1342. "[A]ny assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." *Id.*

Here, all four factors weigh against an enforceable liberty interest. First, the facts indicate that Plaintiff was initially placed in administrative segregation as a result of an investigation into his role as a key participant in the distribution and sale of narcotics at LCF. Thereafter, prison officials reasonably found that Plaintiff was an escape risk based on statements made in a letter written to him.[6] Plaintiff admits that on three separate occasions thereafter, he was convicted of trafficking or possessing

---

[6] Plaintiff correctly notes that the EDCF general order regarding "readable mail" stated that the responsibility for the content of letters and packages rests with the sender, Dk. 64, Exh. 5, and does not provide for the addressee's punishment or status change. But that general order does not prohibit placing an inmate in a higher security status if the contents of a letter lead officers to a reasonable belief that the recipient is a security or escape risk.

contraband, including cell phones. According to Warden Bruce, "[c]ell phones are one of the most concerning devices an inmate can possess. Not only do cell phones permit the inmate to communicate beyond the ability of the correctional facility to monitor him, but an inmate with a cell phone can actually execute an escape plan with those on the outside, which was another serious concern about plaintiff possibly attempting an escape." Dk. 55, Exh. 4.

Plaintiff has been in administrative segregation for over five years since his last contraband offense, but the prison's view is that administrative segregation continues to be necessary to preclude this Plaintiff from receiving dangerous contraband. Plaintiff has repeatedly demonstrated his ability to establish relationships with staff, to manipulate them, and to persuade them to facilitate or to overlook the delivery of dangerous contraband to him. That Plaintiff remains likely to engage in similar behavior if released from administrative segregation is apparent from the brief he filed in this case, stating that he considers cell phones to be "easily obtainable and virtually ubiquitous in the prison system." Dk. 64, p. 7.

These incidents all implicate security, and preserving or promoting security by use of administrative segregation is a legitimate goal for prison officials. The BOP has met its burden to show a reasonable relationship between Plaintiff's isolation and its asserted penological interests. *See Rezaq*, 677 F.3d at 1014.

Secondly, the conditions of Plaintiff's confinement, even if harsh, were not extreme or atypical. Plaintiff contends that in February of 2006, he was housed in an "MRA" slam cell, normally used for mentally disturbed or most disruptive inmates, and that the filth and noise caused him extreme mental and physical stress.[7] The facts fail to raise a material question of fact that the conditions Plaintiff endured in administrative segregation may be atypical or extreme. *See Schmitt v. Rice,* No. 08–3047–SAC, 2010 WL 3775526, at *4 (D.Kan., Sept. 21, 2010) (lack of exercise and exposure to noise and odors unpleasant but not atypical), *aff'd,* 421 Fed. Appx. 858 (10th Cir. 2011). *See generally Rhodes*, 452 U.S. at 347 (stating "restrictive and even harsh [conditions] are part of the penalty that criminal offenders pay for their offenses against society.") Plaintiff additionally contends that he was not permitted to participate in a self-help program. But prisoners have no constitutional right to do so. *See Joseph v. United States Federal Bureau of Prisons,* 232 F.3d 901, 2000 WL 1532783, at 2 (10th Cir. Oct. 16, 2000) (" 'Prisoners have no constitutional right to educational … opportunities during incarceration.' " (citations omitted)).

Thirdly, no allegation is made that Plaintiff's placement in administrative segregation increased the duration of his confinement. Plaintiff was sentenced to four consecutive life sentences, and has not shown

---

[7] Plaintiff also complains that temperatures in the "slam cell" at HCF were so extreme in June of 2005 that he suffered heat stroke one day. This claim is time-barred, but even if timely would not alter the court's analysis.

that his parole eligible date of 2093 has been affected by his confinement in administrative segregation.

Finally, at first blush, Plaintiff's placement in administrative segregation appears to be indeterminate, since Plaintiff has already been in administrative segregation for over sixteen years and the record does not reveal that Plaintiff's placement there was for any specific length of time. But duration alone is not the focus of indeterminacy. *Rezaq*, 677 F.3d at 1016. Indeterminacy primarily focuses on the frequency and meaningfulness of the reviews of Plaintiff's status. *See Wilkinson,* 545 U.S. at 211 (finding solitary confinement to be indefinite because the placement was reviewed only annually, after the initial 30-day review,); *Compare DiMarco*, 472 F.3d at 1343-44 (finding confinement not indefinite where inmate had regular reviews every 90 days). The Tenth Circuit has found that "[t]he availability of periodic reviews merely suggests that the confinement was not indefinite." *Rezaq,* 677 F.3d at 1016 (finding placement in administrative segregation not indefinite where inmate had reviews twice a year, despite inmate's placement there for almost thirteen years).

The periodic review process at HCF, LCF, and EDCF included opportunities for the Plaintiff to participate. Although Plaintiff has been in administrative segregation at these facilities for many years, the record reflects that the prisons conducted regular reevaluations of Plaintiff's placement in administrative segregation via twice-yearly program reviews,

28

as well as various monthly reviews. These periodic reviews included adequate procedural protections, including notice and an opportunity for Plaintiff to speak, and the Warden's review of the Segregation Review Board's (SRB) recommendations. Plaintiff participated in over half of the SRB hearings noted the record, Dk. 55, Exh. 19, and makes no suggestion that the review hearings themselves were substantively perfunctory or meaningless. *Compare Toevs v. Reid*, 685 F.3d 903, 907 (10th Cir. 2012) (finding Constitution requires meaningful periodic reviews during an inmate's placement in administrative segregation in a stratified incentive program because its sole stated purpose was to encourage inmate to improve his future behavior); *Hewitt v. Helms,* 459 U.S. 460 (1983), *abrogated in part on other grounds by Sandin v. Conner,* 515 U.S. 472, 483 (1995).

Instead, Plaintiff alleges that he stopped attending SRB hearings because he believed his requests to the SRB were futile, having been told that only the Central Office could decide to return him to general population. But the record belies Plaintiff's claim that he stopped attending SRB hearings at any point in time, and instead reflects that Plaintiff attended at least four SRB hearings at LCF and three at HCF on dates sprinkled throughout 2006–2008, then attended the hearings consistently at EDCF in 2009.[8] Dk. 55-19. At any rate, the Court need not "closely review the process at this stage." *Rezaq*, 677 F.3d at 1016, citing *DiMarco,* 473 F.3d at 1343 (concluding that

---

[8] The record does not include any chronological detail after 2009.

confinement was not indefinite where prisoner had reevaluations every ninety days and had the opportunity to be heard at the meetings). This factor weighs against finding a liberty interest.

Plaintiff has failed to raise a material question of fact that his long-term confinement in administrative segregation created a liberty interest. Therefore, "no particular process was constitutionally due or required." *Templemen v. Gunter*, 16 F.3d 367, 371 (10th Cir.1994).

### 2. Sufficient Procedural Protections

But even if Plaintiff's long confinement in administrative segregation gave rise to a protected property or liberty interest, the facts do not suggest that Plaintiff may have been denied due process. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "Prisoners held in lawful confinement have their liberty interests curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. Due process is satisfied if Plaintiff received: (1) a sufficient level initial level of process, *i.e.,* a reasoned examination of the assignment; (2) the opportunity to receive notice of and respond to the decision; and (3) safety and security concerns are weighed as part of the placement decision. *DiMarco*, 473 F.3d at 1344 (citation omitted). The foregoing discussion regarding the periodic reviews provided to Plaintiff and the stated reasons for Plaintiff's continued placement in administrative segregation

demonstrates that each of these elements is satisfied, and that Plaintiff received, as a matter of law, all the process which was due him.

### 3. 8th Amendment

Plaintiff also asserts that his continued placement in administrative segregation violates the Eighth Amendment.

The Court disagrees. Even construing Plaintiff's complaint liberally and viewing the record in the light most favorable to him, the Court finds that his allegations do not come within the purview of the Eighth Amendment's prohibition against cruel and unusual punishment. The denial of privileges which normally accompanies confinement in administrative segregation does not amount to a denial of life's necessities or present a sufficiently serious potential for harm, nor does the record reveal officer's deliberate indifference to any risk to plaintiff's health or safety. *See Ajaj v. United States,* 293 Fed.Appx. 575, 582–84 (10th Cir. 2008) (finding conditions such as "lockdown 23 hours per day in extreme isolation," "indefinite confinement," and "limited ability to exercise outdoors" did not, individually or in concert, amount to an 8th Amendment violation).

## IX. Searches/Surveillance (claim 8)

Plaintiff next contends that Defendants Werholtz and McKune harassed him and invaded his privacy by monitoring his every move within his cell 24-hours a day via two video cameras, and by searching his cell five or more times a week. Plaintiff contends these acts violated the Fourth, Fourteenth,

and Eighth Amendments. Defendants contend they placed the video cameras outside of Plaintiff's cell as part of the protocol instituted at HCF, LCF and EDCF to prevent the Plaintiff from acquiring dangerous contraband. The cameras monitored who had contact with Plaintiff and recorded the frequent searches of his cell for contraband.

## A. Fourth and Fourteenth Amendments

The United States Supreme Court has held that the Fourth Amendment has no applicability to a prison cell because [t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson,* 468 U.S. at 526.

> [C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities. ... The task of determining whether a policy is reasonably related to legitimate security interests is "peculiarly within the province and professional expertise of corrections officials." *Id.*, at 548, 99 S.Ct. 1861. This Court has repeated the admonition that, " 'in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters.' " (Citations omitted.)

*Florence v. Board of Chosen Freeholders of County of Burlington*, __ U.S. __, 132 S.Ct. 1510, 1517 (2012).

That Plaintiff considered the video monitoring and searches to be harassment does not change this result. *See Hudson*, 468 U.S. at 529-30. Plaintiff has not raised a material question of fact that the searches or monitoring were the product of calculated harassment unrelated to prison

32

needs. The same analysis defeats Plaintiff's Fourteenth Amendment claim. *See Florence*, __ U.S. __, 132 S.Ct. 1510 (analyzing strip search invasion of privacy claims under Fourth and Fourteenth Amendment identically.)

### B. 8th Amendment

Plaintiff also contends that the searches and surveillance violated the Eighth Amendment, but his allegations are not sufficiently grave to rise to implicate the Eighth Amendment. No facts suggest that the searches and monitoring of Plaintiff's cell either deprived Plaintiff of essential human needs or reflected the officer's deliberate indifference to his health or safety. *See Perkins*, 165 F.3d at 809. Plaintiff does not identify any physical abuse or any physical injury he suffered related to the searches of his cell or the video monitoring. Rather, he concedes that the searches were routinely done when he was absent from his cell. Instead, his claim appears to be based on some unidentified nonphysical injury, such as the feeling that his privacy has been invaded. But a 1983 claim "cannot stand ... unless the plaintiff has suffered a physical injury in addition to mental or emotional harms." (Citations omitted.) *Wallin v. Dycus*, 381 Fed.Appx. 819, 824, 2010 WL 2232264, 4 (10th Cir. 2010). Summary judgment on this claim is warranted.

### X. Religious Liberty (claim 10)

Plaintiff next contends that Defendants Werholtz and Phelan forced him to declare a change of religion in violation of the free exercise and establishment clauses of the First and Fourteenth Amendments. Because the

Fourteenth Amendment contains no free exercise or establishment clause, and because Plaintiff's establishment clause claim is conclusory, the Court examines solely Plaintiff's First Amendment free exercise claim. *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) ("Although [the court] must liberally construe [a] pro se petition, *see Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991), we are not required to fashion [a party's] arguments for him where his allegations are merely conclusory in nature and without supporting factual averments. *Id.*")

### A. Undisputed Facts

On December 3, 2003, Plaintiff, while a Catholic, received a Celtic cross that was approved by Chaplain Dow of EDCF. In April of 2006, while Plaintiff was at LCF, a Catholic Priest visited the Plaintiff and blessed his Celtic cross with holy water, and did not question its religious significance. On August 23, 2007, EDCF Chaplain Phelan came to Plaintiff's cell to deliver a chain Plaintiff had ordered to replace his old one. Phelan refused to deliver the chain until Plaintiff displayed his cross. Plaintiff's Celtic cross had a circle in its center and contained no image of Jesus Christ on it, so was not a crucifix. Upon viewing Plaintiff's Celtic cross, Chaplain Phelan stated that he could not deliver the chain because Plaintiff's cross, although approved for some religions, was not approved as a Catholic religious artifact, and would be confiscated as contraband. Chaplain Phelan knew that Plaintiff's stated religion was Catholic and that IMPP 10-110 thus prohibited Plaintiff from

possessing the Celtic cross. Chaplain Phelan told Plaintiff that he could keep the cross only if he changed his religious preference, so asked if Plaintiff would sign a change of religion form.

Plaintiff told Chaplain Phelan he must be mistaken, because his cross had previously been approved by Chaplain Dow, and blessed by a Catholic priest. Nonetheless, Plaintiff immediately got a change of religion form from his own documents, stated his change of religion from Catholic to Protestant, and gave it to Chaplain Phelan so he could keep his cross. Plaintiff then filed grievance number CA0015476 at EDCF, but was unsuccessful. Defendant Phelan's response to Plaintiff's grievance notes that Plaintiff could have submitted a "Request for Accommodation of Religious Practices" to seek an exception to IMPP 10-110, Dk. 55, Exh. 15 at p. 6, but the record shows that Plaintiff did not do so. In 2011, Plaintiff completed another Change of Religion Request from Protestant to Seventh Day Adventist. (Doc. 55-36, *Martinez* Report). Seventh Day Adventists, as Protestants, are permitted to have a Celtic cross. Defendants concede Plaintiff has exhausted his administrative remedies on this issue.

IMPP 10-110 sets forth the rules governing religious matters for KDOC inmates. It states "...inmates shall not be permitted to possess any religious items other than a religious medallion ... or such artifacts as are included among the items of personal property referenced in Attachment D ... and specifically allowed by IMPP 12-120." Attachment D to that IMPP permits

Catholics to possess a "Saints medal, Crucifix, and Chain," and permits only Protestants, Seventh Day Adventists, and Unity adherents to have a "Cross and Chain." Chaplain Phelan reasonably believed that under this policy Plaintiff was not allowed to possess the cross he had unless he changed his religious preference. *See also* Dk. 55, Exh. 38, p. 6 ("Inmates shall not be permitted to wear religious ... jewelry or other ornaments ... that is not otherwise allowed by IMPP 12-127 or the general orders of the facility ..." ).

### B. Free Exercise

Prisoners retain a First Amendment right to practice their religion, but a regulation that infringes an inmate's free exercise of religion is nonetheless constitutional if prison administrators establish that the regulation is a rational means of furthering their legitimate penological interest. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52 (1987).

To show a constitutional violation based on a free exercise claim, a prisoner-plaintiff must survive a two-step inquiry:

> [He] must first "show that a prison regulation substantially burdened [his] sincerely-held religious beliefs. If the inmate meets this burden, the defendant bears "the relatively limited burden" of showing that the prison regulation at issue is "reasonably related to legitimate penological interests." *Id.* (quoting *Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)); *Boles v. Neet,* 486 F.3d 1177, 1181 (10th Cir. 2007).

*Sayed v. Profitt,* 415 Fed.Appx. 946, 948, 2011 WL 924476, 2 (10th Cir. 2011).

Defendants contend that the policy and Chaplain Phelan's enforcement of it did not significantly inhibit Plaintiff's religious conduct or expression, or meaningfully curtail Plaintiff's ability to express adherence to his faith, or deny Plaintiff a reasonable opportunity to engage in fundamental religious activities. *Wares v. Simmons*, 524 F. Supp. 2d 1313, 1319 (2007); (citing *Vasquez v. Ley*, 1995 WL 694149, *2 (10th Cir. 1995).) Defendants recognize that symbols of one's faith may "play an important role in expressing an individual's adherence to a particular faith." *Werner v. McCotter*, 49 F.3d 1476, 1481 (10th Cir. 1995). But Plaintiff's Celtic cross did not represent the Catholic faith to which he ascribed, although it may have had great personal significance to the Plaintiff. Plaintiff chose to change his stated religious affiliation so that he could keep the Celtic cross, but did not seek an exception to the policy which may have permitted him to retain both his Catholic religion and his cross. Plaintiff later changed his stated religion again, to another which would permit him to keep the cross. (See Dk. 55, Exh. 34-Plaintiff's Change of Religion Request from non-denominational Christian to Catholic on 2/20/01; Exh. 35-Plaintiff's Change of Religion Request from Catholic to Protestant on 8/23/07; Exh. 36—Plaintiff's Change of Religion Request from Protestant to Seventh-Day Adventist on 2/4/11.) Plaintiff's petition concedes that he "change[d] his religious denomination to Protestant on paper but not in his heart or practices." Dk. 1, p. 8. But even assuming that Plaintiff had sincerely-held religious beliefs which impelled his

change of religions, he has not shown that IMPP 10-110 substantially burdened any sincerely-held religious belief he held, or that any Defendant coerced him into changing his religion.

It is thus unnecessary for Defendants to show a legitimate penological interest in the regulation. The Court notes, however, that the Tenth Circuit requires such an interest to be established by evidence of record in this case rather than by mere reference to other cases examining the same regulation. *See Boles*, 486 F.3d at 1182-83.

Plaintiff has not established the existence of a genuine issue of material fact regarding Defendants' violation of his free-exercise rights, or any other federal rights. Defendants are thus entitled to qualified immunity from this suit.

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (Dk. 58) is granted.

Dated this 28th day of August, 2012, at Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge